UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

ELISHA DENA WILLIS             CIVIL ACTION 1:16-CV-00784

VERSUS                          JUDGE TRIMBLE

U.S. COMMISSIONER, SOCIAL       MAGISTRATE JUDGE PEREZ-MONTES
SECURITY ADMINISTRATION

REPORT AND RECOMMENDATION

I.    Background

Elisha Dena Willis ("Willis") filed applications for disability insurance benefits ("DIB"), Medicare benefits, and supplemental security income ("SSI") benefits on April 18, 2013 (Doc. 6-1, pp. 142, 146/630), alleging disability onset dates of January 1, 2010 and September 1, 2010 (Doc. 6-1, pp. 142, 146/630) due to bladder disease, herniated disc in back, and neck problems (Doc. 6-1, p. 179-630). Those applications were denied by the Social Security Administration ("SSA") (Doc. 601, p. 93/630).

A de novo hearing was held before an Administrative Law Judge ("ALJ") on May 1, 2014, at which Willis appeared with her attorney and a vocational expert ("VE") (Doc. 6-1, p. 26/630). The ALJ found that, although Willis suffers from "severe" impairments of residual effects from multiple cervical spine surgeries, migraine headache, and degenerative disc disease of the lumbar spine, she has the residual function capacity to perform sedentary work except for work involving more than occasional climbing of stairs or ramps, more than occasional stooping kneeling,

crouching, or crawling, or more than occasional overhead reaching with bilateral upper extremities (Doc. 6-1, pp. 11, 12/630). The ALJ further found Willis can perform work that exists in substantial numbers in the economy such as administrative assistant. Therefore, Willis was not disabled at any time through the date of the ALJ's decision on November 24, 2014 (Doc. 6-1, p. 17/630)

Willis requested a review of the ALJ's decision, but the Appeals Council declined to review it (Doc. 6-1, p. 5), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Willis than filed this appeal for judicial review of the Commissioner's final decision. Willis raises the following issues on appeal (Doc. 7):

1. The ALJ erred in the formation of Willis's residual functional capacity.

2. The ALJ erred in her evaluation of Willis's work attempt.

The Commissioner responded to Willis' appeal (Doc. 8) and Willis filed a reply (Doc. 9). Willis's appeal is now before the Court for disposition.

## II.    Administrative Record

### A.    Medical Records

Willis has a high school education and past relevant work as an administrative coordinator for a state hospital, a customer service representative for a trash collection service, a loan processor for a mortgage company, and a receptionist (Doc. 6-1, pp. 180, 201/630).

In February 2010, Willis was examined by Dr. Bharat Guthikonda, a neurosurgeon, for her complaint of neck pain since a motor vehicle accident nine years

before, and left upper extremity pain for one year (Doc. 6-1, p. 324/630). Dr. Guthikonda found Willis had normal, equal strength bilaterally in her upper extremities and a normal gait (Doc. 6-1, p. 324-25/630). An MRI showed C5-6 with a herniated nucleus pulposus with canal and foraminal compression (Doc. 6-1, p. 325/30). Dr. Guthikonda diagnosed cervical spinal stenosis (Doc. 6-1, p. 324/630) and recommended anterior cervical discectomy and fusion surgery (Doc. 6-1, p. 325/630). Willis underwent the surgery on February 8, 2010 (Doc. 6-1, p. 328/630).

On March 3, 2010, Willis reported worsening neck and left arm pain with burning sensation and increased weakness in her left arm (Doc. 6-1, p, 331/630). Willis had normal, equal strength in her upper and lower extremities, and the x-rays of her fusion looked good (Doc. 6-1, p. 331/630). Dr. Guthikonda prescribed physical therapy and a steroid pack (Doc. 6-1, p. 331/630). In May 2010, Willis had postoperative changes or a straightening of the normal cervical curvature, but had well-maintained vertebral body heights (Doc. 6-1, p. 333-334/630). There was no compression at the left C5-6 foramen (Doc. 6-1, p. 335/630).

Dr. Gerald Leglue, Jr., a physical medicine and rehabilitation doctor, began physical therapy for Willis in March 2010. Dr. Leglue performed acupuncture prior to therapy, which improved Willis's pain and range of motion (Doc. Doc. 6-1, p. 240/630). After 8 weeks months of physical therapy (Doc. 601, pp. 247-322), Willis continued to have pain in her neck and distal pain in her hand and fingers, and Dr. Leglue concluded her physical therapy goals had not been met (Doc. 6-1, pp. 243, 246/630).

In August 2010, Willis had left-sided occipital neuralgia-type pain that was treated with Botox injections (Doc. 6-1, p. 337-630). The Botox injections provided temporary relief (Doc. 6-1, p. 340/630). Willis underwent a left occipital neurectomy in September 2010 (Doc. 6-1, pp. 341, 608-14/630). Two weeks later, Willis had overall improved symptoms (Doc. 6-1, p. 342/630).

In October 2010, Willis was examined in the LSU Health Sciences Center in Shreveport (Doc. 6-1, p. 400/630). Willis reported she did not have any pain (Doc. 6-1, p. 400/630).

In January 2011, Dr. Matthew S. Mosura, a pain medicine (anesthesiology) specialist, treated Willis's cervical radiculitis with a cervical epidural steroid injection (Doc. 6-1, p. 368/630).

By February 2011, Willis's occipital neuralgia was improved, as well as her neck and left upper extremity symptoms (Doc. 6-1, p. 349/630). An MRI of Willis's lumbar spine showed mild disc bulging at L4-5 and L5-S1 (Doc. 6-1, pp. 351, 370/630). Willis alleged that her pain completely interfered with her general activities, mood, walking ability, normal work both in and outside of her home, relationships with other people, sleep, and enjoyment of life (Doc. 6-1, p. 364/630). Willis had full ranges of motion and good grip strength, but pain in her cervical spine (Doc. 6-1, pp. 354-66/630). Willis was prescribed Percocet and Oxycontin (Doc. 6-1, p. 366/630).

In April 2011, Willis reported some improvement in her life activities, but continued neck and arm pain, as well as low back pain radiating into her left buttock

(Doc. 6-1, p. 359/630).  Zanaflex and Fioricet were added to her medications (Doc. 6-1, p. 361/630).

In June 2011 (Doc. 6-1. p. 355/630), Willis complained of persistent pain in the upper and lower neck bilaterally, radiating to her left shoulder and arm, as well as headache, spasm, tingling, and weakness (Doc. 6-1, p. 355/630).  Willis alleged that her pain again completely interfered with her general activities, mood, walking ability, normal work both in and outside of her home, relationships with other people, sleep, and enjoyment of life (Doc. 6-1, p. 355/630).  Dr. Mosura found Willis had left neck, shoulder, and arm pain consistent with radiculopathy in the left C6/C7, but that she was strong in her left arm (Doc. 6-1, p. 357/630).  Dr. Mosura found opioids were medically necessary for her pain control and prescribed Percocet, Oxycontin, Neurontin, and Cyclobenzapine (Doc. 6-1, p. 357/630).

In June 2011, Willis continued to have low back pain, occipital neuralgia (improved), and neck and left upper extremity symptoms (improved) (Doc. 6-1, p. 404/630).  An MRI of her lumbosacral spine showed no significant stenosis (Doc. 6-1, pp. 404, 406/630).  Surgery was not recommended (Doc. 6-1, p. 404/630).

Willis lost her health insurance coverage and began going to LSU Health Sciences Center in Shreveport ("LSU-HSC") (Doc. 6-1, p. 353/630).

In November 2011, Willis was evaluated at the Interventional Pain Clinic in LSU-HSC (Doc. 6-1, p. 396/630).  Willis also reported some depression and anxiety due to pain and financial problems (Doc. 6-1, p. 396/630).  Willis was diagnosed with post-cervical laminectomy syndrome, bilateral lumbar radiculopathy (right with

straight-leg raising and left per history), right sacroiliitis, left piriformis syndrome, right hip pain, right sacral dysfunction (the right left length is slightly longer than the left), myofascial pain, depression, and financial and social issues (Doc. 6-1, p. 396/630). Willis was prescribed oxycodone, Neurontin, Flexeril, and Fioricet, and referred to the psychiatric clinic (Doc. 6-1, p. 396-97/630).

In January 2012, Willis was evaluated at LSU-HSC for complaints of neck pain (Doc. 6-1, p. 384/630). Willis reported past neck surgery that was "moderately beneficial" but still complained of cervical radiculopathy for a year that was worse on the left (Doc. 6-1, p. 384/630). Willis said her cervical pain radiated into her left arm and her fifth finger on her left hand, was intermittent and chronic, stabbing and severe, occasionally radiated into her right hand, and was worse at night and with certain activities such as holding the phone (Doc. 6-1, p. 384/630). Willis's cervical range of motion was limited, more on the left (Doc. 6-1, pp. 385, 421/630). Willis was prescribed gabapentin for her cervical radicular pain, Percocet for cervical facet joint syndrome, Cymbalta for chronic pain syndrome, and Flexeril for her myofacial muscle pain (Doc. 6-1, pp. 385-86, 422/630). Willis received a cervical epidural steroid injection for her cervical radiculopathy in February 2012 (Doc. 6-1, p. 597/630).

In April 2012, Willis had the same chronic neck pain, which she said was relieved by heat, medications, and lying down (Doc. 6-1, p. 386/630). Willis was diagnosed with cervical radiculopathy, cervical facet syndrome, chronic pain syndrome, and myofascial neck pain (Doc. 6-1, p. 387/630). Willis was diagnosed with cervical facet joint pain by Dr. Seth T. Billiodeaux, a pain medicine specialist, in both

April and May (Doc. 6-1, pp. 388, 429-432/630). Willis underwent diagnostic left-sided medial branch blocks at C5, C6, and C7 (Doc. 6-1, p. 596/630).

In June 2012, Willis reported her neck pain was aggravated by twisting and exertion, she also had myalgia and nausea, and she had moderate relief from oral narcotics, NSAIDs, relaxation, immobilization, and heat (TENS) (Doc. 6-1, p. 390/630). Willis had decreased cervical range of motion due to posterior neck pain, a tender right trapezius trigger point, and her neck pain was worse with extension (Doc. 6-1, p. 391/630). A diagnosis of migraine was added (Doc. 6-1, pp. 392, 434/630), and Willis underwent an occipital nerve block (Doc. 6-1, pp. 393, 439/630).

In September 2012, Willis had symptoms of migraines and occipital neuralgia, she reported photophobia and intolerance to noise at times (Doc. 6-1, p. 392/630). Willis consented to an occipital nerve block and she was given a trial of Imitrex p.m. (Doc. 6-1, p. 392/630). Willis also had epigastric pain, low back pain, and neck pain, and was diagnosed with postlaminectomy syndrome in the cervical region and backache (Doc. 6-1, p. 442/630).

In November 2012, Willis reported her neck pain had started getting worse while she was sleeping; it was sharp, throbbing pain in her right neck, shoulder, and arm that woke her up (Doc. 6-1, pp. 407, 444, 519/630). Willis was unable to use her right arm (Doc. 6-1, pp. 407, 444/630). The pain worsened with activity and medications did not help (Doc. 6-1, pp. 407, 444/630). However, the range of motion and strength in both shoulders was normal, and her gait was normal (Doc. 6-1, pp. 409, 446/630). An MRI of her cervical spine showed a very small, extruded disc

fragment arising from the C4-5 disc (Doc. 6-1, p. 545-46/630). Willis was diagnosed with neck pain, cervical spinal stenosis, status post cervical spinal fusion, and a bulging disc (Doc. 6-1, p. 407/630).

In December 2012, Willis had a decreased range of motion in her neck and tenderness at intrascapular midline, posterior cervical, and her right shoulder was tender with abnormal flexion and extension (Doc. 6-1, pp. 414, 451/630). Willis was wearing a soft cervical collar (Doc. 6-1, p. 414/630). An MRI showed a small right posterior lateral C4-5 disc protrusion (Doc. 6-1, p. 452/630). Willis was diagnosed with neck pain and cervical spinal stenosis, and was deemed a candidate for surgery (Doc. 6-1, pp. 415, 452/630). Willis underwent an anterior cervical discectomy with fusion at C5/6 and C4/5 (Doc. 6-1, pp. 416-17, 456-57, 464-66/630).

In January 2013, Willis complained of headaches and neck pain aggravated by bending, exertion, twisting, walking, and stress (Doc. 6-1, p. 468/630). Willis stated the surgery had improved her neck pain and she no longer had pain radiating into her right arm, but shooting and burning pain was radiating into her left arm that was worsened by activity and neck movement (Doc. 6-1, p. 469/630). Willis said medication, lying flat, and heating pads relieved her pain (Doc. 6-1, p. 469/630). Willis still had cervical stenosis of her spinal canal, migraines, chronic pain syndrome, and lumbosacral pain (Doc. 601, p. 471/630). However, by February 2013, Willis's spine was fusing well with good alignment and instrumentation (Doc. 6-1, pp. 418, 475/630).

In April 2013, Willis reported worsened symptoms including constant burning starting in the base of the neck, radiating to both hands, and aggravated by activity (Doc. 6-1, p. 478/630). Activities of daily living were difficult (Doc. 6-1, p. 478/630). Mild tenderness and spasm were noted over the para spinals in the cervical region bilaterally, and Willis had decreased extension and lateral rotation (Doc. 6-1, p. 480/630). Willis was diagnosed with cervical stenosis of her spinal canal, cervical radiculopathy, and post laminectomy syndrome (Doc. 6-1, p. 480/630).

In July 2013, Lester Barnett, a psychologist, made a psychological assessment of Willis for the SSA, based on her medical records (Doc. 6-1, p. 66/630). Barnett found Willis had a bout of situational depression about one year before, and had a mild restriction of activities of daily living, mild difficulties maintaining concentration, persistence, or pace, and one or two repeated episodes of decompensation (Doc. 6-1, p. 66/630). Barnett concluded the effect of Willis's depressive condition on her capacity for employment was non-severe.

Also in July 2013, Dr. Gerald Dzurik assessed Willis's physical condition, for the SSA, from her medical records (Doc. 6-1, pp. 69-69/630). Dr. Dzurik concluded Willis can lift/carry less than ten pounds frequently, stand/walk up to two hours in an eight hour day, sit up to six hours in an eight hour day, do unlimited pushing and pulling (except as limited by weight limitations for lifting and carrying), can only occasionally climb ramps/stairs/ladders/ropes/scaffolds, can only occasionally bend, kneel, crouch, and crawl, and is limited bilaterally in reaching overhead (Doc. 6-1, p. 69/630).

In July through December 2013, Dr. Eric Dugan, a primary care provider, evaluated Willis and diagnosed classic migraine, reflux esophagitis, cervical pain, and bronchitis (Doc. 6-1, pp. 583-588/630). Willis was prescribed Cymbalta, Flexeril, Imitrex, Neurontin, Omeprazole, and Percocet (Doc. 6-1, pp. 588/630). In January and February 2014, Willis was treated for a urinary tract infection (Doc. 6-1, pp. 581-82/630).

In August 2013, Willis was also evaluated for tenderness at the midline posterior cervical and left shoulder (Doc. 6-1, p. 592/630). Willis had regained full use of her right arm, and had normal shoulder flexion, extension and abduction in both arms (Doc. 6-1, p. 592, 594/630).

In April 2014, an x-ray of Willis' cervical spine showed a fixation plate and screws at C4-5, but no acute findings or malalignment (Doc. 6-1, p. 630/630).

Michael Willis wrote a letter on April 7, 2014 that stated Willis has neck pain daily that prevents her from doing normal activities such as cleaning, driving, working, and spending time with her family (Doc. 6-1, p. 235/630). Michael Willis stated that family members usually have to pick Willis' daughter up from school and run her errands (Doc. 6-1, p. 235/630). Michael Willis also stated that how well Willis feels depends on medication, rest, and weather, and that Willis's physical condition causes her to be depressed (Doc. 6-1, p. 235/630).

B. **Administrative Hearing**

Willis had an administrative hearing in May 2014 before an ALJ (Doc. 601, p. 26/630). Willis appeared with her attorney and a vocational expert ("VE").

Willis testified that she lives with her mother and her 15-year-old daughter (Doc. 6-1, p. 32/630). Willis's mother is disabled, but Willis does not have to assist her mother in any way (Doc. 6-1, p. 33/630).

Willis testified that she completed high school (Doc. 6-1, p. 33/630). Willis does not work and does not have any income except child support (Doc. 6-1, p. 33/630).

Willis worked from 2008 to 2010 for the State of Louisiana as an administrative coordinator for the nursing department at Pinecrest Hospital (Doc. 6-1, p. 33/630). Willis did clerical work such as scheduling, typing, filing, checking tests, and sending data entries and drug test results to Baton Rouge (Doc. 6-1, p. 34/630). Willis lifted/carried up to 20 or 25 pounds (Doc. 6-1, p. 34/630). Willis spent most of her day sitting at her desk (Doc. 6-1, p. 34/630). Willis loved that job and said it was difficult to resign from it (Doc. 6-1, p. 49/630).

Willis testified that she return to work from December 2011 to March 2012, doing customer service and clerical work for IES Outwaste Management (Doc. 6-1, pp. 43-44/630). However, Willis was not able to perform all of her duties and had to miss work, so she was terminated (Doc. 6-1, p. 44/630). Willis missed about a week of work in less than three months due to her medical problems, and had trouble typing, holding the phone, sitting for a long time, and concentrating (Doc. 6-1, p. 44/630).

Willis testified that she still has constant pain in her neck, particularly the left side of her neck, left shoulder, and left arm (Doc. 6-1, pp. 34-35/630). The pain is

worse when Willis tries to lift anything, when she does chores, and while driving (due to holding her arms up and turning her head) (Doc. 6-1, p. 35/630).

Willis testified that she also has a lot of headaches (Doc. 6-1, p. 35/630). Willis wakes up with a headache most mornings and has a severe migraine two or three times a month (Doc. 6-1, p0. 35-36/630). When she has a migraine, Willis stays in to bed for two or three days, vomits often, and may lose her sight (Doc. 6-1, p. 36/630). Willis takes Imitrex and Fioricet for her migraines and uses an ice pack (Doc. 6-1, p. 36/630).

Willis testified that she burned her left hand (she is right handed) (Doc. 6-1, p. 36/630). Willis testified that she has pain sometimes when she has to grasp something and sometimes her hand is sore (Doc. 6-1, p. 36/630). Willis does exercises for her hand at home every day (Doc. 6-1, pp. 36-37/630). The burn clinic told her to keep putting lotion on it, keep wearing her glove, and keep doing her exercises (Doc. 6-1, pp. 41-42/630). Willis said it was improving (Doc. 6-1, p. 42/630). Willis had tingling and numbness in her left hand that comes and goes (Doc. 6-1, p. 42/630).

Willis testified that she drives her daughter to school if she is able, then goes back home and rests until her medicine takes effect (Doc. 6-1, p. 37/630). Willis then does dishes or laundry, makes the bed, and straightens the bathroom for 20 to 30 minutes, until she starts hurting again, then she sits down for 20 to 30 minutes (Doc. 6-1, pp. 37, 42/630). Willis takes two or three naps each day (Doc. 6-1, p. 37/630). Willis picks up her daughter from school, returns home, and rests (Doc. 6-1, p.

37/630).  Willis tries to make supper, but hurts if she stands more than 20 minutes (Doc. 6-1, p. 37/630).

Willis testified that she does a lot of her own grocery shopping, and has people who do it for her (two or three times a month) when she cannot (Doc. 6-1, pp. 37-38/630).  Willis testified that pushing and trying to turn the buggy can be too heavy for her, she has difficulty walking long periods of time, and she may need help loading and unloading the groceries (Doc. 6-1, p. 38/630).

Willis attends church when she can, at least twice a month, and sometimes is able to sit through the entire one-hour service (Doc. 6-1, p. 38/630).  Willis walks around outside but does not rake, cut grass, or plant flowers (Doc. 6-1, p. 39/630).  Willis testified that she loves to hunt, fish, and ride four-wheelers, but had to stop doing those things about three years ago (Doc. 6-1, p. 39/630).

Willis testified that she has problems sleeping at night because her neck gets cold, she gets a headache, or she cannot get comfortable (Doc. 6-1, p. 39/630).  Willis uses her heating pad a lot (Doc. 6-1, p. 39/630).  Willis does not take a sleeping aid (Doc. 6-1, p. 39/630).

Willis testified that she still sees her neurologist, but that the LSU Health Sciences Center pain management clinic closed (Doc. 6-1, p. 40/630).  Willis's neurologist recently ordered an MRI of her low back and took x-rays of her neck (Doc. 6-1, p. 40/630).  Willis has had low back pain for several years, but it recently increased (about three weeks before the administrative hearing) when sitting and

standing (Doc. 6-1, p. 41/630). Willis went to the emergency room for her back pain and received a steroid shot due to inflammation in her back (Doc. 6-1, p. 41/630).

Willis had her first neck surgery (a fusion) in 2010, and her second in December 2012 (Doc. 6-1, pp. 44-45/630). The first surgery was not successful because her occipital nerve was not where it should have been and the surgeon spent 30 minutes looking for it, which inflamed other nerves and caused numb spots (Doc. 6-1, p. 46/630). The second surgery did not help much because she has problems looking up or down, turning her head to the left, sitting for a long time, and having migraines (Doc. 6-1, p. 45/630).

Willis testified the most weight she can lift/carry is 15 pounds (Doc. 6-1, p. 42/630). Willis cannot return to work, even for a job such as receptionist, because she would have to look down to type, would have to use her left arm and hand, would have to hold a phone and write a message, and would have to sit for a long time (Doc. 6-1, p. 47/630). Willis testified she cannot go to work if she gets a headache (Doc. 601, p. 47/630). Willis cannot pick up coins with her left hand, and cannot turn a cola cap or a doorknob with her left hand (Doc. 601, p. 47/630).

Willis uses a TENS unit two or three times a day for 15 minutes, and takes Neurontin for nerve pain, hydrocodone for pain, prednisone, and Imitrex and Butalbital for headaches (Doc. 601, pp. 47-48/630). Willis has medication side-effects such as dizziness and sleepiness (Doc. 601, p. 48/630). After she takes her medications, Willis can focus on a television show for about half an hour (Doc. 601, p. 48/630).

Willis testified that she is doing everything she can to get better (Doc. 601, p. 48/630).

The VE testified that Willis' past relevant work as an administrative coordinator for the nursing department at a residential facility was administrative assistant work, which is sedentary, SVP 7, skilled, DOT 169.167-010, and required frequent reaching, handling, and fingering (Doc. 601, p. 51/630).

The ALJ posed a hypothetical involving a person of Willis' age, education, and work experience, who is limited to sedentary work, can occasionally climb stairs or ramps, stoop, kneel, crouch, or crawl, can occasionally reach overhead with either arm, and can frequently finger and handle with both hands (Doc. 601, pp. 51-52/630). The VE testified that such a person would be able to do Willis' past relevant work as an administrative assistant (Doc. 601, p. 52/630).

The ALJ modified the hypothetical so the person has the same residual functional capacity as before and has no limitation in handling and fingering with her dominant hand, but can only occasionally finger and handle with her non-dominant hand (Doc. 601, p. 52/630). The VE testified that such a person would not be able to work as an administrative assistant because she would not be able to do the amount of typing and computer input that would be required (Doc. 601, p. 52/630). However, such a person could work as an information clerk (sedentary, SVP 4, semi-skilled, DOT 237.367-022, 146,983 jobs nationally and 2436 jobs in Louisiana) or an appointment clerk (sedentary, SVP 3, semi-skilled, DOT 237.367-010, 184,051 jobs nationally and 3050 jobs in Louisiana) (Doc. 601, p. 52/630). The VE further testified

Willis's transferrable job skills are the ability to use standard office machines, maintain records, make reports (oral and written), and communication skills (Doc. 601, pp. 52-53/630).

The VE testified that, if the person missed two or more days of work each month, she would be let go (Doc. 6-1, pp. 53-54/630). The VE also testified that if the person were off-task up to one-third of the day, she would be let go (Doc. 6-1, p. 54/630). The VE testified that, if the person made one or more errors daily as to scheduling, giving appointments, or giving information, she would not be able to maintain her job (Doc. 6-1, p. 55/630).

## C.    ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Willis (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found: (1) Willis has not engaged in substantial gainful activity since August 24, 2012; (2) her disability insured status expired after December 31, 2013; and (3) she has severe impairments of the residual effects from multiple cervical spine surgeries, migraine headache, and degenerative disc disease of the lumber spine (Doc. 6-1, pp. 14-15/630). However, Willis does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Doc. 6-1, pp. 14-15/630). At Step No. 5 of the sequential process, the ALJ further found that Willis has the residual functional capacity to perform sedentary work except for no more than occasional climbing of stairs or ramps, no more than occasional stooping, kneeling, crouching, or crawling, and no more than occasional overhead reaching bilaterally (Doc. 6-1, p. 16/630).

The ALJ then found that, as of December 31, 2013, Willis was able to perform her past relevant work as an administrative assistant (Doc. 6-1, p. 20/630). The sequential analysis thus ended at Step 4, with a finding that Willis was not disabled (Doc. 6-1, p. 20/630).

III.  **Law and Analysis**

A.  **Scope of Review**

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors.  See McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  See Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence that support the Commissioner's decision, but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  See Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  See Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  See Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981); see also Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law.  See Dellolio,

705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." See Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

**B.    The ALJ did not err in evaluating Willis's residual functional capacity.**

Willis contends the ALJ erred in evaluating her residual functional capacity. Willis argues the ALJ failed to consider her complaints of back and neck pain, and failed to find her complaints as to the effects of her migraines fully credible.

A claimant's impairments may cause physical or mental limitations that affect what he can do in a work setting. Residual functional capacity is a medical assessment, based upon all of the relevant evidence, of the work a claimant can perform despite his or her limitations. See 20 C.F.R. §404.1545, §416.945. It is only if the claimant proves that she is unable to engage in her past relevant work[1] (Step 4) that the burden of proof shifts to the Commissioner to show the claimant is able to perform some other type of substantial work in the economy (Step 5). Greenspan v. Shalala, 38 F.3d 232 (5th Cir. 1994); Scott v. Heckler, 770 F.2d 482, 484 (5th Cir. 1985); Ferguson v. Schweiker, 641 F.2d 243, 246 (5th Cir. 1981).

Willis contends the ALJ erred in rejecting her subjective complaints of back and neck pain. Although a claimant's assertion of pain or other symptoms must be considered by the ALJ, 42 U.S.C. § 423(d)(5)(A) requires that a claimant produce objective medical evidence of a condition that reasonably could be expected to produce

---

[1] Past relevant work is work a claimant has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for the claimant to learn to do it. See 20 C.F.R. § 404.1560(b)(1).

the level of pain alleged.  See Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2000).  The mere existence of pain does not automatically create grounds for disability, and subjective evidence of pain will not take precedence over conflicting medical evidence.  See Harper v. Sullivan, 887 F.2d 92, 96 (5th Cir. 1989) (citing Owens v. Heckler, 770 F.2d 1276, 1281 (5th Cir. 1985)).

A claimant's symptoms, including pain, will be determined to diminish a claimant's capacity for basic work activities to the extent that the claimant's alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence.  See 20 C.F.R. §404.1529(c)(4).  Although severe pain can constitute a nonexertional impairment, pain is a disabling condition only when it is constant, unremitting, and wholly unresponsive to therapeutic treatment.  See Chambliss, 269 F.3d at 522.

While pain can be severe enough to create a disabling condition, the evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled. See Elzy v. Railroad Retirement Bd., 782 F.2d 1223, 1225 (5th Cir. 1986); Loya v. Heckler, 707 F.2d 211, 215 (5th Cir. 1983).  The factual determination of whether the claimant is able to work despite some pain is within the discretion of the Administrative Law Judge and will be upheld if supported by substantial evidence. See Fortenberry v. Harris, 612 F.2d 947, 950 (5th Cir. 1980).  Hence, the law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints

and articulate his reasons for rejecting any subjective complaints. Falco v. Shalala, 27 F.3d 162, 163-64 (5th Cir. 1994).

The ALJ made the following findings as to Willis's pain and credibility (Tr. pp. 18-20/630):

> [B]y August 2013 the clinical presentation of [Willis's] neck was normal. The clinical evaluation that date indicated that the claimant's neck had full ranges of motion, as did the remainder or her musculoskeletal system. Moreover, motor function was 5/5 in the shoulders. This evidence suggests that the last surgical procedure produced positive results.
>
> Nonetheless the claimant continued to claim ongoing problems with her neck, including significant pain. However, several inconsistencies raise some questions regarding the actual extent of her claimed problems. For example, she testified at the hearing that she has been using a TENS pain control device on a daily basis. However, there is no mention of this device in any medical records generated after August 2012. In addition, she testified that she experiences problems looking up and down and from side to side. Yet the last report from the neurosurgeon at LSU demonstrated full ranges or motion with no spasm and no neurological deficits. Further while the claimant testified to trouble with interruption of sleep due to pain, there is no documentation by her doctors of actual signs or symptoms of sleep deprivation, or any indications that the claimant has received insufficient rest. This is not to say the claimant is symptom or pain free; however, these inconsistencies raise doubts as to the claimant's overall credibility.
>
> *          *          *
>
> …The claimant has stated that her work activity stopped due to the adverse effects of her impairments, but no corroboration for this is found in contemporaneous medical records. In fact, LSUMC visit records state that in April 2012, the claimant reported that her neck pain was aggravated by "typing, holding phone, cleaning." Yet nothing in the record evidence indicates that her doctor advised her to stop working or to limit her work activities in any way.
>
> At the hearing the claimant testified that she experiences side effects from medications.…There are no significant changes in her medication, which would tend to corroborate the conclusion that no debilitating side effects are present.…

In contrast to the absence of adverse side effects, there is actual evidence of the therapeutic effect of her treatment….

\*         \*         \*

The diagnosis supports a conclusion that the medication which the claimant has been taking is an effective treatment which has ameliorated the worst effects of the headaches. In fact, none of the records from the clinic show that the complaint of migraine or headache is one of the reasons for her visits. Minimal workup has been done for this complaint and the claimant's statements regarding the severity of this condition are unsupported by her medical records.

The ALJ has made the mandatory indication of the basis for her credibility choices concerning Willis's complaints. Since her choices are not unreasonable, her finding that Willis's pain would not prevent Willis from performing all work is proper. Carry v. Heckler, 750 F.2d 479, 485-86 (5th Cir. 1985). Moreover, although the ALJ did not find Willis's complaints of migraine pain fully credible, she found Willis suffers from migraines and takes migraine medication. Therefore, Willis's complaint that the ALJ gave no weight to her ongoing migraine treatment is incorrect.

Willis also argues that additional information, other than the doctor's range of motion evaluations, should have been considered by the ALJ. However, the ALJ specifically noted other factors such as Willis's medications, her complaints of medication side effects, her complaints of sleep deprivation, her normal motor function, her lack of neurological deficits, and the fact that no doctor had ever advised her to limit her activities or stop working. Therefore, the ALJ considered a wide range of factors in determining Willis's residual functional capacity and ability to perform her past relevant work.

Substantial evidence supports the Commissioner's conclusion that Willis is not disabled by pain and can perform her past relevant work as an administrative assistant.

C.    <u>The ALJ did not err in his evaluation of Willis's work attempts.</u>

Willis also contends the ALJ erred by giving too little weight to Willis's work attempt. SSR 96-9p states that attempted work attempts are to be considered in the residual functional capacity assessment. Willis argues that her work attempt was unsuccessful because of her physical limitations, and the ALJ should have incorporated those limitations into the hypothetical suggested to the vocational expert.

The record shows that Willis's last work attempt[2] was from December 2011 through March 2012, as a customer service representative for a trash collection service (Doc. 6-1, pp. 43-44, 168, 201/630). Willis testified she was let go from that job because she could not perform all of her job duties and had to miss work (Doc. 6-1, p. 44/630). Willis's description of that job shows she had to walk/stand three to four hours per day, sit six to seven hours per day, and lift less than 10 pounds frequently, but up to 20 pounds sometimes (Doc. 6-1, p. 202/630).

Willis's work attempt involved "light work".[3] However, the ALJ found Willis can do only "sedentary work," and that her past relevant work as an administrative

_____

[2] If a claimant worked six months or less, it is considered to be an unsuccessful work attempt if the claimant stopped working or reduced work and earnings below substantial gainful activity earning level because of her impairment or because of the removal of special conditions that took into account her impairment and permitted her to work. <u>See</u> 20 C.F.R. § 404.1574(c)(3).

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this

assistance was sedentary work.[4]  Therefore, the fact that Willis had an unsuccessful

work attempt at light work does not indicate that she cannot perform sedentary work.

The ALJ's finding that Willis could perform her past relevant work indicates

the ALJ's conclusion that Willis did not meet her burden of proving that she could

not return to such work.  Willis argues that she cannot return to her work due to

neck pain.  However, Willis has not carried her burden of proving that she suffers

from disabling pain.

Therefore, substantial evidence supports the Commissioner's finding that

Willis can perform her past relevant sedentary work as an administrative assistant.

## IV.   Conclusion

Based on the foregoing, IT IS RECOMMENDED that Willis's appeal be

DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b),

parties aggrieved by this Report and Recommendation have fourteen (14) calendar

days from service of this Report and Recommendation to file specific, written

objections with the Clerk of Court. A party may respond to another party's objections

within fourteen (14) days after being served with a copy thereof.  No other briefs (such

---

category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b) and § 416.967(c).

[4] "Sedentary work involves lifting no more than 10 pounds  at a time and occasionally lifting or carrying articles  like docket files, ledgers, and small tools.  Although  a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary  if walking and standing are required occasionally and other sedentary criteria are met."  §404.1567(a).

as supplemental objections, reply briefs, etc.) may be filed. Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this __28th__ day of August, 2017.

Joseph H.L. Perez-Montes
United States Magistrate Judge